C. M. SOLES, ADMINISTRATOR OF D. S. SOLES, v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 1 November, 1922.)

**1. Carriers—Railroads—Commerce—Federal Law.**

Where a common carrier is sued in the courts of this State for damages for personal injury alleged to have been caused by the defendant while employed in interstate commerce, our courts apply the rule for the ascertainment of defendant's actionable negligence recognized and enforced in the Federal courts.

**2. Same—Evidence—Questions for Jury—Nonsuit—Trials.**

In an action to recover damages of carrier in interstate commerce for the negligent killing of its flagman sitting asleep or apparently unconscious on the rail of defendant's track in front of an approaching train, the liability on the part of the defendant for the negligence of its engineer,

on the issue of negligence, depends upon whether he had exercised due care after discovering the perilous condition of the plaintiff's intestate, and the evidence in this case was sufficient to take the case to the jury. The difference between the rule as applied under the State and Federal decisions discussed by WALKER, J.

APPEAL by plaintiff from *Connor, J.,* at November Term, 1921, of COLUMBUS.

Civil action to recover damages for death of plaintiff's intestate, alleged to have been caused by defendant's negligence.

We will first state the material portion of the evidence, it being partly the defendant's statement of it, but principally the part taken by us from the record itself.

It seems necessary to give the substance of the testimony fully, as the court below nonsuited the plaintiff upon it.

The defendant, through its agent, David Faulk, trestle foreman, employed plaintiff's intestate, who was a boy about fourteen years of age, after having been forbidden by the boy's father and mother to do so, for the reason that the employment was dangerous and the father and mother were not willing that the boy should be exposed to the risk; and, notwithstanding the agent had been so informed, the boy was employed at Tabor, N. C., on Saturday or Sunday, and carried to a point near Smithfield, N. C., on defendant's line, where he was killed the following Tuesday, while sitting on the right-hand side of the rail with his feet toward the center of the southbound track of defendant's railroad, and with his elbows on his knees, something like this (witness indicating), with his head in his hands, dropped over like that (witness indicating), and apparently asleep. It was a bright, warm, sunshiny day.

The train was a freight, and had exploded two torpedoes on the track five or six hundred yards from where the boy was killed, and, notwithstanding this noise, and the sounding of the whistle and other noises, the boy did not move from the time the train came in sight until he was struck by the engine (having a cowcatcher), run over, and his body severed, the upper part of it being left on the outside of the rail and the legs on the inside, without any bruises.

C. M. Soles testified: "I am the administrator of my son, D. S. Soles; his mother is now living. He was 14 years old and five months, lacking 7 days. We had him in school most of the time. He had done some work around there. He worked for me. I never paid him anything when he worked for me. He worked all the way from 50 cents down to something like 25 and 50 cents an hour for other people. He was perfectly healthy. As healthy a boy as I have ever seen. I have never had to call a doctor for him but once, and that was a little bilious attack, but he was up the next day sitting around the house. I live in

Mount Tabor, in Columbus County. To Smithfield from Tabor the fare on the railroad is $4.98. I don't know what the distance is. My boy went off on Sunday evening and Tuesday morning I got the news about the middle of the day, I suppose somewhere between twelve o'clock and maybe one, of his death. He was working under David Faulk, trestle foreman. He spoke to me about employing the boy. Mr. Faulk employed hands. This is the same trestle foreman who had a talk with me, under whom he was working at the time he was killed, while in the employ of the Atlantic Coast Line Railroad Company. He asked me and his mother if he could carry this boy back with him to Enfield. I think, if I am not mistaken, he was stationed at Enfield at that time. He asked me if he could take the boy up there. The boy, I guess, knew we wouldn't let him go. We told him that he could not go. His mother asked him if that wasn't dangerous work, and he said it was. She said he simply could not go, and I told him I didn't want him to go. We went off to the farm. We had a farm out there, nine miles. Faulk came after him after we went there, and said that the boy had written him a letter and told him if he would let him know when he came back he would go back with him, that his mother and I (his father) had agreed for him to go back. I told him if the boy had written that, he had written something not so; that we didn't agree for him to go. I did not know until he was killed the actual time he was employed. He went off Sunday evening; we missed him Monday morning, and Tuesday about one o'clock I got the telegram. The only way I knew he had gone off with Faulk was what his little brother said about it. This boy had no legal guardian appointed by the court. I did not see the boy after he was killed. I have been to where they said he was killed. I am about 52 years old. I will be 52 the first day of December. My son, D. S. Soles, was not married. My wife is a year younger than I am. I had older children, they were all married and moved away. He contributed to the support of myself and wife. All of the work he did he did with us. He did work around the house when he was not in school. He worked around the house before and after school. The character of the work when he was not in school was principally plowing and working on the farm. He did the same work I was paying $2.50 a day to have done. When he worked out for other people, we used the money in the family. He had not done much work off. I am unable to work. I have a kidney trouble that works me and am unable to do any work at all, unless it is light work, mighty light. I don't know what kind of kidney trouble I have. The doctor told me I had kidney trouble. He told me I was seriously afflicted with kidney trouble; that my time was short, and I wouldn't live very long. I have six children older than this boy. The married children do not contribute anything to my sup-

port. I don't know whether he would contribute anything to my support or not, but he wasn't married. I don't know whether he would have gotten married or not. He was an intelligent boy and weighed about 125 pounds and did whatever I told him to."

J. Y. Baker testified: "I live in Johnston County, between Four Oaks and Smithfield. I was 700 or 800 yards from D. S. Soles when he was killed on the main line, which was well graded and double-tracked. The train was going up the grade and the boy was a little bit over the tip of the grade. From the north track was straight 66 rails. I counted them. I saw the boy before he was killed walking around on the track. I saw him about fifteen minutes after he was killed. The boy was cut in two across the lower part of his body. His head lying on outside of rail, his feet on inside of outside rail on southbound track, he had no bruises at all. Eight or ten cars had passed over his body. You can see about 60 rails a man lying down on the track. It was up-grade. Mr. Soles had me to count the rails with Mr. Stanley. My place is about four hundred yards from where the boy was killed. My grist mill about one hundred yards. From Neuse River going south, the main Atlantic Coast Line track runs up-grade and then down to Black Creek. This train was a freight train, and I guess it runs from Rocky Mount, N. C., to Florence, S. C. I did not see this accident, but I saw the boy about fifteen minutes before the accident and he was walking about. I was too far off to tell whether he had the flag in his hand or not, but I knew he was up there and I saw him walking around."

C. G. Norris testified: "At the time the boy was killed I was working on the trestle force of the Atlantic Coast Line in Johnston County under D. M. Faulk, the foreman, with D. S. Soles. I was on top of the trestle at the time he was killed, about four hundred yards north of him. He was flagging. He took a flag when he left us. I heard the train blow before it came around the curve. I looked up and saw the boy. It looked as if he was sitting on the right-hand rail on the southbound track. It looked as though he might have been sitting on the railroad on the side of the rail with his elbows on his knees, something like this (witness indicates), with his head in his hands, dropped over like this (witness indicates). He was facing the inside of the track. I said on the rail on the right-hand side going south. He didn't move that I could tell. I was looking at him when the train hit him. He was sitting down and they blowed three or four short blows at him. It looked like it knocked him off the track on the outside. The engine had a cowcatcher coming to a point in front. I went down to where he was killed. The track was straight and up-grade for three or four hundred yards, I guess. When he left the construction force he carried a flag and some torpedoes. I saw him place the torpedoes. Five or six hun-

·dred yards north of where he was killed. They were placed cross-ways the rail with little fasteners bent under the rail. They make a noise when the train strikes them. I heard a noise like the torpedoes but ·couldn't say it was that. Mr. Faulk, the trestle foreman of the railroad, employed me, and he was in charge of the gang. He employed others before and after me. I am 23 years old and a native of Columbus County. We left him along the track as we were going to work with his flag and torpedoes. I was in the car with Mr. Faulk and this boy when Mr. Faulk took him out and dropped him at the place where he was to flag, and the balance went on down to the trestle in the motor car. We left him at a certain place with a flag and some torpedoes for the purpose of flagging the train. He was to protect the people working on the trestle. Mr. Faulk told him carefully about flagging the train. He told him he must flag it and that he must, under no circumstances, go to sleep. I heard him tell part of it. I heard him tell him that if anything whatever came down there to flag it until he called him in. He told him he must be very careful to flag it. He gave him a flag. I heard the train blow a signal whistle before I saw it strike him. And just a short while before he was struck, I heard the engine make sharp warning signals. I heard the brakes. They made considerable fuss. I was on the trestle. From my estimate it is 4 or 5 hundred yards from where the boy was struck. The boy was north of Black Creek, a little south of the top or peak of the grade, about twenty-five yards. When the engine came over the peak and sounded the warning, the boy looked to be sitting there with his hands on his knees. If he moved I didn't see him. Faulk went to the boy immediately."

D. J. Stanley testified: "I live about one mile from where the boy was killed. I was about 75 yards away when he was killed. I heard the train blow on the other side of the trestle. I heard it cross the draw bridge, and then it commenced blowing. I heard the torpedoes. The train kept blowing and continued to blow. I was at the edge of the right of way. I saw the boy when he was run over. He was cut right in two. His head was on the right-hand side of the rail and his body ·on the inside. Eight cars passed over his body after the engine and tender. It was a warm, sunshiny day. It was hot. I saw the boy out there the day before. He was flagging. Some gentleman was out with him the day before who looked to be instructing him. I saw him about nine or ten o'clock. I saw him about 20 minutes before he was killed. I saw him from time to time that morning. I saw him walking up and down the track with a flag in his hands. I am a carpenter and was working by the track that day. It was a through freight train. I saw him often while going to the spring. I spoke to him something like half an hour before he was killed. He was standing up then. I didn't

see the accident. After the train crossed the river it exploded two torpedoes close to the curve, it then blowed as if blowing for signals. I heard the engineer put on the brakes, they were severe, but he waited until he got on him to put them on. I went there immediately and helped to get him out, and counted the cars that passed over him. There was a bunch of bushes between where I was working and where he was killed, and I could not see him."

Mrs. C. M. Soles testified: "I am the mother of D. S. Soles, deceased. He was too young to be married. I know the trestle gang foreman he was working for when killed. I told him 'No, sir,' when he asked me about the boy working for him. He told me that it was dangerous. I am fifty years old. He was the oldest boy at home, and the largest one and the healthiest one, was the reason why I depended on him.

"Q. How, in regard to being able to work, was he? A. Why he was perfectly healthy and able as any boy I have ever seen to know anything about, of his age.

"The court: You mean you were depending upon him? A. I depended upon him for anything he could make.

"The court: What I mean is, you were depending on him because he was a boy and until he was 21 you expected him to stay at home? A. Yes, sir; I certainly did.

"The court: After he was 21, what would you expect? A. I would expect him to stay with me until he got married or wanted to go out for himself.

"He could read and write. He was a truthful boy. I depended on what he told me. I did not tell him he could go with Faulk. If he wrote to Faulk that I didn't object to him going, I undoubtedly did not agree to it. If he wrote the letter it was a mistake somewhere. I cannot be positive about his handwriting. I found him a truthful boy."

Defendant moved to nonsuit plaintiff; motion sustained; plaintiff excepts, and appealed from the judgment.

*H. L. Lyon and Irvin B. Tucker for plaintiff.*
*Rountree & Carr for defendant.*

WALKER, J. We will assume in the discussion of this case, that D. S. Soles, the flagman, was guilty of contributory negligence in going to sleep upon the track, and thus exposing himself to grave peril, and which did result in his death. But this is not all of the case, as the question still remains to be decided, whether the engineer, *after he discovered the peril of the intestate,* had sufficient time, with the appliances at hand, by the exercise of due care, to prevent the injury. The rule of this Court is, in ordinary cases, that if by the exercise of due care he

could have discovered the peril of the intestate in time to have avoided
the result, the defendant would be liable.   But we are proceeding under
the Federal statute, and must decide according to the Federal law, as
expounded by its highest Court.

 The rule, under the law as applied by the Federal courts in cases of
negligence, is that the defendant is liable, if it could have avoided the
injury which, in this case, caused the death of the intestate, by the
exercise of ordinary care, only after discovering his perilous situation.
*Judge Taft,* referring to this principle in *Newport News and M. W. Co.
v. Howe,* 52 Fed. Rep., 362, used this pertinent language: "As applied
to cases like the present, therefore, we believe the rule relied on by the
counsel of plaintiff below should be construed to mean that the negli-
gence of the plaintiff will be no defense, if the defendant, *after he knew
the peril of plaintiff,* did not use due care to avoid it."   And adverting
to certain expressions of the Court relating to the same question in
*Inland & Seaboard Coasting Co. v. Tolson,* 139 U. S., 551, he said:
"This would seem to show that, in the opinion of the Supreme Court of
the United States, knowledge of plaintiff's peril was required to make
the rule applicable."   And in *Little Rock R. and E. Co. v. Billings,* 173
Fed. Rep., 903, *Justices Van Devanter, Sanborn,* and *Pollock* thus state
the rule of the Federal Court, applying it to a state of facts very much
like those we have here:   "As deduced from the foregoing authorities,
and many others that might be cited, this qualification may be stated as
follows: A., who by his own negligent act or conduct, has placed himself
in a position of imminent peril, of which he is either unconscious or
from which he is unable to extricate himself if conscious, may not be
carelessly, recklessly, or wantonly injured by B., who, after he has dis-
covered and knows the helpless and perilous condition of A., and has it
within his power to avoid doing him an injury by the exercise of reason-
able care and diligence in the use of such instrumentalities as he can
command; and the failure to exercise such reasonable care and diligence
on the part of B. under such circumstances will constitute actionable
negligence, rendering him liable in damages to A., notwithstanding the
prior negligent act of A. in placing himself in position to receive the
injury."   This rule was expressed substantially the same way in *Grand
Trunk R. Co. v. Ives,* 144 U. S., 408 (36 L. Ed., 485), and in *Southern
Railway Company v. Gray,* 241 U. S., 333 (60 L. Ed., 1030).   See, also,
*Buckworth v. Grand Trunk Western Railway Co.,* 127 Fed. Rep., 307;
*N. Y., etc., R. Co. v. Kelley,* 93 Fed. Rep., 745; *Smith v. R. R. Co.,* 210
Fed Rep., 414.   And so, when dealing with a Federal question, we must
apply the common law as construed and administered in the United
States courts.   *Western Union Telegraph Co. v. Milling Co.,* 218 U. S.,

406; *S. C. R. R. Co. v. Finan,* 153 Ky., 340; *Sou. Ry. Co. v. Howerton,* 105 N. E. (Ind.), 1026, opinion by *Justice Myers.*

It seems to us, therefore, that, considering the special and peculiar facts of this case, the question is, as was said in *Newport News and M. W. Co. v. Howe, supra,* by *Justice Taft,* and in *Railway Co. v. Gray, supra,* by *Justice McReynolds,* whether the engineer had sufficient time after he actually discovered the dangerous situation of the intestate, by the exercise of due care, to have avoided the injury to the boy which resulted in his death. In the *Gray case, supra,* there was held to be no such evidence, but here we must hold, upon the testimony, that there was some under which the jury might reasonably have found, as a fact, that after the engineer first actually discovered the flagman's peril, he had sufficient time with the means and appliances at his command to have brought his engine and cars under such control, as eventually to have stopped them, if it became necessary to meet the emergency, in that way, and save the flagman's life. One of the witnesses, Mr. Norris, testified that he was on the top of the trestle at the time the intestate was killed, about four hundred yards north of him. He heard the train blow before it came around the curve, and, looking up, saw the boy, and he appeared to be sitting on the right-hand rail and on the southbound track, with his elbows on his knees and his head in his hands. He did not move although they sounded the whistle three or four times, which attracted Norris' attention at the distance he was from the place. · The track was straight and up-grade for three or four hundred yards. The intestate had placed his torpedoes and they exploded with the usual noise when the train struck them. This and other evidence was sufficient for the jury to find that the intestate was sitting on one rail of the track with his elbows on his knees, his position indicating that he was asleep and unconscious of the approach of the train, and that this appeared to the engineer in time for him to take the proper measures to put his train under control and to stop it, if need be, to avoid killing the boy; and, again, the jury, when they have been apprised of all the facts—the defendant having introduced no testimony—may conclude that the engineer had not sufficient time to act and save the boy after he first discovered, if he did discover, the true situation. The jury might even find, upon the facts as now disclosed, that the engineer had no such time, as was required for the purpose, to act prudently and save the boy, after he first saw him. But that does not signify that there is no evidence to the contrary. As the case now stands, there is evidence tending to establish either of the two contentions, and as reasonable men might differ in regard to it, the jury must decide the question. The torpedoes exploded with the usual attendant and loud noise, and the engineer sounded the signals with the whistle which was calculated to warn one

not asleep or unconscious, but the continued silence and stillness of the boy, he not having moved or responded to them, was at least some notice to the engineer that he was unaware of his surroundings and the impending danger, as he still sat in deep, oblivious slumber.

It may be, too, that the engineer did not actually see him in time to have stopped his train, if he found it necessary, but this must be decided upon the testimony, there being sufficient circumstances at present to show that he probably did see the boy asleep on the track, and not conscious of the train's approach, at a time when he could have stopped his train by the exercise of ordinary care, if it was required to prevent injury to the boy. We repeat that the jury must find, in order to charge the defendant with liability for negligently killing the boy, that the engineer did see the danger to the boy in time, by the exercise of ordinary care, to have saved him. This is the rule which is upheld in the Federal courts.

Two reasonable men might come to different conclusions upon the testimony as now developed, which makes the case one for the jury, whereas, when it is fully heard, it may, perhaps, be easily seen that there was no culpable negligence. It is not clear now that there was none, and while the evidence is not of a definite or entirely satisfactory, and certainly not of a conclusive, character, it would be difficult to say that there was absolutely none, or less than a scintilla of proof.

In this view of the case it is not imperatively required that we should consider at this time the other question raised by the plaintiff, and we will therefore leave it for future decision, when we are confronted by such a necessity.

The nonsuit must be set aside and a new trial awarded.

New trial.